## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON

JESSE AARON BLEVINS,

      Petitioner,

v.                               **Case No. 3:14-cv-18133**

PATRICK A. MIRANDY, Warden,
St. Marys Correctional Center,

      Respondent.

### PROPOSED FINDINGS AND RECOMMENDATION

On June 12, 2014, Jesse Aaron Blevins (hereinafter "the petitioner") filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1).  This matter is assigned to the Honorable Robert C. Chambers, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is the respondent's Motion for Summary Judgment (ECF No. 7). For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 7), **DENY** the petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1), and dismiss this civil action from the docket of this court.

### PROCEDURAL HISTORY OF PETITIONER'S CASE

#### A.    The petitioner's conviction and sentence.

The petitioner is serving a 15-year sentence for voluntary manslaughter, followed by a consecutive 1-5 year sentence for concealment of a body, after being convicted of

those charges by a jury in the Circuit Court of Cabell County on January 26, 2012. (ECF No. 1 at 1). The charges arose out of the death of the petitioner's girlfriend, Elizabeth Grace Cotton, on July 28, 2009. As will be discussed in greater detail *infra*, the petitioner allegedly confessed to his friend, David Frye, that he had killed Cotton and put her body under his house. He allegedly asked Frye to help him move her body. However, Frye refused to do so and subsequently called the police, who came to the petitioner's house and ultimately located Cotton's body in the basement. The petitioner was arrested, given his *Miranda* rights, and then confessed to the police.

<u>Pre-trial suppression hearings</u>

The petitioner was initially indicted by a Cabell County grand jury in Indictment No. 09-F-324, which is not part of the record before this court. Thereafter, on March 22, 2010, the petitioner, by counsel, filed a Motion to Suppress the fruits of the search of his residence. (ECF No. 7, Ex. 2). On April 14, 2010, the Circuit Court of Cabell County held a hearing on the Motion to Suppress. (*Id.*, Ex. 3). During that hearing, Corporal Robert Stinnett testified that he received a "meet complainant" call and he and Officer Cowell went to meet with Frye. (*Id.* at 43-44). Frye told them that the petitioner had told him that he had killed his girlfriend and wanted Frye to help him move the body to the river. (*Id.* at 44). Stinnett then contacted his commander, Lieutenant Larry Zimmerman. (*Id.* at 45-46).

Zimmerman testified that Stinnett contacted him about a possible murder and they went to the house to both "contain the crime scene" and "to determine if, indeed, there was a subject dead or dying in the home." (*Id.* at 10). The police were also aware that the petitioner and Cotton shared a young child, so they were "worried about the safety of the

child as well as the victim." (*Id.* at 11). Thus, Zimmerman dispatched several units to the scene. (*Id.* at 46).

The police surrounded the house and saw the petitioner looking through the window. Zimmerman called out "for anyone inside the home to come out of the home with their hands up." (*Id.* at 10). The petitioner complied. (*Id.* at 11-12). The police directed the petitioner to get down on his knees and they patted him down for safety purposes. Zimmerman then asked the petitioner if he knew why they were there. (*Id.* at 12). When the petitioner said he was not sure, Zimmerman asked the petitioner where his girlfriend was. The petitioner responded "in the basement." (*Id.*) Sergeant Ashworth then asked what she was doing in the basement, and the petitioner stated "she's dead." (*Id.*) At that point, the petitioner was handcuffed and placed in a police cruiser. No further questioning took place. (*Id.* at 50).

Zimmerman said they "still did not know at that time that – a hundred percent that we had a body or a dead person inside." (*Id.* at 31). Thus, Zimmerman, along with Sergeant Ashworth, Corporal Franklin, and several other officers announced their presence and then went into the house to look for the woman and the child. (*Id.* at 13). They ultimately located a trap door in the kitchen that led to a cellar. Franklin went into the cellar and found the deceased victim's body wrapped up. (*Id.* at 14-15). The child was not in the house. (*Id.* at 15). At that point, Zimmerman contacted the Detective Bureau, the Crime Scene Unit, the Chief of Police and the Patrol Captain. (*Id.*)

The petitioner's counsel argued for suppression of the petitioner's statements and any evidence found in the house, asserting:

> It's my contention that Mr. Blevins was under arrest from the minute he
> came out of that house because Officer Stinnett testified he wasn't free to
> leave. Officer Zimmerman testified he wasn't free to leave. They asked him

3

incriminating questions which led to any probable cause they would go into the house to ask or see if anybody was injured.  Without that statement from him they have no reason to go in the house without a warrant.

* * *

So I would suggest that not only was the warrantless search of the house a violation of the Fourth Amendment Right against search and seizure, that anything that they got in that house as a result of that illegal search and seizure is bad.

Then I would suggest that Mr. Blevins' statement before that makes all of that bad because that's what gave them they got in there.  He was obviously not read his Miranda rights.  It was not a spontaneous admission by a party to the thing because they specifically asked him a question designed to incriminate him, which we all know when you are under arrest and not free to leave the police aren't allowed to do without advising him of his rights.  We know that didn't happen.

Then we have him that he takes down to the station and then they get a full confession, which results from facts that they gleaned from a search that they went on they couldn't have to begin with when they didn't Mirandize him.  So unless there was a subsequent Miranda statement signed with the statement that he made at the police station, the confession should be thrown out.

(*Id.* at 85-86).  However, the Circuit Court ruled that there were "exigent circumstances under the facts of this case.  No search warrant was needed under the facts of this case." (*Id.* at 92).

On May 24, 2010, the petitioner filed another Motion to Suppress concerning his initial statements to police, arguing that he gave incriminating answers to specific questions asked by the police officers without receiving *Miranda* warnings.  (*Id.*, Ex. 4).  On May 27, 2010, the Circuit Court held another hearing to address that motion; however, no further evidence was taken.  (*Id.*, Ex. 5).  Again, the Circuit Court ruled that the initial statements made by the petitioner were admissible, as well as his subsequent custodial confession, which was given after he received and waived his *Miranda* rights.  (*Id.* at 26).

4

*Interlocutory appeal*

On June 10, 2010, the petitioner filed an Emergency Interlocutory Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV") concerning the Circuit Court's rulings on the admissibility of his statements to police and the evidence found in the house. (*Id.*, Ex. 7).  On June 30, 2010, the Clerk of the SCAWV directed the petitioner to file a brief addressing whether his appeal was from a final order. (*Id.*, Ex. 8).  However, defense counsel did not file such a brief and, on April 26, 2011, the SCAWV granted the petitioner's motion to withdraw the interlocutory appeal. (*Id.*, Ex. 9).

*Second indictment*

Meanwhile, on August 4, 2010, the petitioner had been re-indicted in Indictment No. 10-F-253, which charged him with Murder and Concealment of Deceased Human Body. (*Id.*, Ex. 6).  The State moved for a *Nolle Prosequi* of the first indictment, which was dismissed on August 10, 2010. (*Id.*, Ex. 1 at 1-2).

*Rule 404(b) hearing and rulings*

On May 11, 2011, and May 16, 2011, respectively, the State provided notice that it intended to use Rule 404(b) ["404(b)"] evidence regarding nine different instances of violence against Cotton by the petitioner. (*Id.*, Exs. 10 and 12).  On September 28, 2011, the State amended its notice to provide more specific information about the 404(b) evidence. (*Id.*, Ex. 11).

On October 21, 2011, the Circuit Court held a motions hearing to address the 404(b) issues.  Before hearing from the State's witnesses, the petitioner's counsel proffered his own evidence showing the victim's propensity towards violence for the purpose of establishing a self-defense theory; however, he did not call any witnesses at the hearing. (*Id.*, Ex. 13 at 8-24).  The Circuit Court stated that "anything involving these

two people would certainly be admissible." (*Id.* at 10). Then, the State presented its 404(b) witnesses.

First, Walter Ivy Ferguson, Jr. ("Ivy") testified that, in December of 2008, Cotton came to his house and had visible bruises. (*Id.* at 46-47). He further testified that, in February of 2009, Cotton called him and had him pick her up at a bar and she told him she and the petitioner had been fighting; however, she had no injuries at that time. (*Id.* at 48-49). Then, Ivy stated, in March of 2009, he overheard a phone call between the petitioner and Cotton and heard Cotton threaten not to let the petitioner see his child again. The petitioner responded, "I will kill you, Bitch." (*Id.* at 49). Ivy also testified about two other arguments between the petitioner and Cotton, including one in May of 2009, in which Cotton's clothes were torn and she accused the petitioner of attempting to rape her. (*Id.* at 51-53).

Next, Rebecca Dolan testified that, in October or November of 2007, she called the police because the petitioner was "beating up" Cotton (punching her in the face and stomach) and dragging her by her hair. (*Id.* at 71-74). When Dolan told him to "get his hands off her," the petitioner threatened to slice Dolan's throat. (*Id.* at 74). Dolan further testified about another specific argument between the petitioner and Cotton in December of 2007, during which the petitioner punched holes in the wall of the hallway of their apartment complex and was subsequently arrested. However, Dolan did not witness that argument herself. (*Id.* at 75-76). She further stated that the petitioner and Cotton fought just about every weekend. (*Id.* at 75).

The third 404(b) witness was Heather McCloud, who testified that she also witnessed the petitioner dragging Cotton by her hair and punching her in the face in October of 2007. (*Id.* at 90-91). Then on Cotton's birthday, the petitioner broke a window

6

in Cotton's apartment because Cotton would not let him in and she called the police. McCloud testified that the petitioner had a knife and threatened to stab McCloud. (*Id.* at 92). McCloud also testified about overhearing an argument between the petitioner and Cotton in April of 2008, while their son was present. McCloud stated that she saw Cotton come out of the apartment with blood all over her. (*Id.* at 93)[1]. She also observed the petitioner and Cotton in a physical altercation in December of 2008, during which the petitioner was throwing punches and put holes in the walls of the hallway. (*Id.* at 93-94).[2]

The fourth and final 404(b) witness, Whitney Burgess, testified that, sometime in 2007, she saw the petitioner "bust out [Cotton's] back glass on her vehicle and slash all four of her tires." (*Id.* at 106). Burgess stated that Cotton's mouth was bloody and that Cotton told her the petitioner had "busted her mouth off of the steering wheel." (*Id.*) Burgess stated that she witnessed the petitioner slash Cotton's tires on two other occasions as well. (*Id.* 107-108). At the conclusion of the hearing, the trial court took the Rule 404(b) motion under advisement.

On September 11, 2012 (eight months after the petitioner's trial concluded), the Circuit Court filed an Order documenting its rulings on the 404(b) evidence. (*Id.*, Ex. 15).[3] Of the evidence summarized above, the Circuit Court determined that Dolan and

---

[1] During cross-examination of McCloud, the petitioner's counsel attempted to establish that Cotton was profusely bleeding because she had slit her own wrists and the petitioner took her to the hospital. (*Id.* at 97-98).

[2] This appears to be the same December 2008 incident about which Dolan testified, but did not witness.

[3] At the outset of the trial, the court noted, "we have had a 404(b) hearing and I am of the opinion it is proper evidence that these acts were committed." (ECF No. 7, Ex. 16 at 7). Furthermore, during later discussions on the record but outside the presence of the jury, the court stated to the prosecutor, "I assume you have told your witnesses what can come in and what cannot?" and the parties acknowledged that they knew what evidence had been judged admissible to show motive or intent (ECF No. 7, Ex. 18 at 666-674). However, the undersigned has been unable to locate any other transcript or order in the evidence of record that documents the court's specific rulings on the admissibility of this evidence prior to the September 11, 2012 Order, which post-dates the trial.

McCloud's testimony about witnessing the petitioner dragging Cotton by her hair and punching her would be admissible. (*Id.* at 2). The Court further ruled that the April 2008 incident where McCloud witnessed Cotton bleeding from the mouth and nose would be admissible, with the opportunity for the petitioner to rebut that evidence with the fact that the injury was self-inflicted. (*Id.*) The Court further ruled that, with the proper foundation, Ivy Ferguson's testimony concerning the petitioner's threat to kill Cotton if she did not allow him to see his child "could be admissible." (*Id.* at 1). However, the trial court excluded the remainder of the evidence the State sought to offer under Rule 404(b).

### *The petitioner's trial*

The petitioner's trial took place over six days between January 18 and January 26, 2012. The State's first witness was David Frye. Frye testified that, earlier in the day on July 28, 2009, the petitioner had stopped by his house and was admiring a knife that was sitting on a table, so Frye told him he could have it. (ECF No. 7, Ex. 16 at 211). The petitioner left the house, but called Frye later that evening and they re-gathered at Frye's neighbor's[4] house. Frye testified that the petitioner brought his son with him and, eventually, the petitioner left and returned with Cotton. (*Id.* at 213). Frye further testified that the petitioner and Cotton spent a lot of time talking alone and appeared to be "trying to work out some problems." (*Id.* at 214). Ultimately, Frye and Bailey drove the petitioner, Cotton and their son back to the petitioner's father's house and then left for the night. (*Id.* at 214-215).

The following day, the petitioner called Frye and asked to meet with him. When Frye met him outside of Bailey's house, the petitioner told him "I killed Elizabeth last

---

[4] The "neighbor" was a woman named Lisa Bailey. Frye referred to her at trial as his "neighbor" or "Lisa." The respondent's brief, however, refers to Bailey as Frye's "girlfriend."

night." (*Id.* at 216-217).  The petitioner further stated, "she's dead" and "she is under the house." (*Id.* at 217).  Frye further testified that the petitioner asked Frye to help him move her body to the river because the ground under the house was too hard for him to dig a grave.  (*Id.* at 217-218).  Frye stated that he told the petitioner to leave.  Frye subsequently told Bailey what the petitioner had said and she "freaked out," so he decided to call the police.  (*Id.* at 218).  Frye then testified about speaking to the police and showing them the location of the petitioner's father's house.  (*Id.*)

On cross-examination, the defense attempted to assail Frye's credibility by focusing on his heavy drinking habit and questioning his ability to correctly remember the details of these events.  (*Id.* at 235-253).  Frye acknowledged that he did not ask the petitioner any questions about how Cotton's death occurred.  (*Id.* at 242).

Following Frye's testimony, the State presented the testimony of various law enforcement officers who were on the scene at the time of the petitioner's admissions or confessions and the search of the residence where Cotton's body was located.  Detective Robert Stinnett testified that, after Frye told him that the petitioner had confessed to killing his girlfriend, they took Frye to identify the house and then returned with additional officers and surrounded the house.  (*Id.* at 259-262).  Stinnett stated that they identified themselves as police officers and the petitioner came outside.  (*Id.* at 263).[5]  He further testified that they asked the petitioner where his girlfriend was and he replied, "[s]he is under the house."  (*Id.*)  Stinnett further stated that he asked the petitioner what he meant and the petitioner "looked me right in the eyes, I mean, with no emotion

---

[5] Stinnett stated that he did not believe any officers had their weapons trained on the petitioner.  (ECF No. 7, Ex. 16 at 267-268).  He acknowledged that they did ask the petitioner to turn around, back up and get down on his knees.  (*Id.* at 268).  Lieutenant Larry Zimmerman, on the other hand, testified that officers did have their weapons drawn.  (*Id.* at 285).

whatsoever and just said – as a matter of fact, just said, 'She is dead.'" (*Id.* at 264). Stinnett stated that, at that point, he handcuffed and searched the petitioner and read him his *Miranda* rights and then drove him to the police station. (*Id.*)

Similar to his testimony during the pre-trial suppression hearing, Lieutenant Larry Zimmerman testified that, after the petitioner told them that his girlfriend was in the basement and was dead, he and other officers entered the house "to check and make sure that we didn't have somebody that may be injured and not actually dead" and also to check on the welfare of the petitioner's child. (*Id.* at 278-79). Both Zimmerman, and Corporal John Franklin testified that they ultimately located a trap door that led to the basement, and Franklin saw something wrapped up with some other items on top of it, which proved to be Cotton's body. (*Id.* at 280-281, 351-356). Zimmerman further testified that, after locating the body, they exited the house and called in the crime scene investigation units. (*Id.* at 281). Zimmerman acknowledged on cross-examination that, at the time they entered the house, they did not have a search warrant or an arrest warrant. (*Id.* at 284).

Detective Michael Cass McMillian, the officer who conducted the station house interview of the petitioner, also testified and the recorded interview was played for the jury. (*Id.* at 373-419). The recording indicates that McMillian advised the petitioner of his *Miranda* rights and the petitioner chose to waive his rights and speak to McMillian. (*Id.* at 378-83). The petitioner told McMillian that he had been with Cotton at Frye's house until about 9:00 0r 10:00 p.m. that night and that they had all been drinking. (*Id.* at 384-387). The petitioner further acknowledged that Frye had given him a fixed blade knife. (*Id.* at 387).

The petitioner further stated that, ultimately, he, Cotton and their son went back to his father's house, where he was staying because his father was on vacation. (*Id.* at

388).  The petitioner stated that, after they put their son to bed, he and Cotton started having sex, but subsequently got into a "fistfight" over another girl the petitioner had been seeing.  (*Id.* at 389).  The petitioner claimed that Cotton pulled a knife on him and he tried to take it from her.  (*Id.* at 390).  He further admitted to trying to choke her as they were wrestling or fighting.  (*Id.* at 392).  The petitioner further stated that they wound up on the ground and he stabbed her under her chin.  (*Id.* at 390, 394).  The petitioner suggested that Cotton died because she suffocated in the blood.  (*Id.* at 391).

The petitioner further told McMillian that, at that point, he panicked and moved Cotton's body to the cellar and cleaned up the blood before taking his son to his mother's house.  (*Id.*)  When he returned to his father's house, he again cleaned the area with bleach and washed his clothes and the towel he had used to clean up the blood.  (*Id.* at 393-394).  He admitted that he wrapped Cotton up in a sheet and then covered the sheet with two garbage bags.  (*Id.* at 395-396).  He further stated that he was going to try to bury Cotton under the house; however, he denied asking Frye to help him do so.  (*Id.* at 396-398).  He further admitted that he threw the knife that killed Cotton into the sewer, and further stated that he took the knife that Cotton had wielded to his mother's house and placed it in a table drawer.  (*Id.* at 398-401).

McMillian further testified that he did not observe any knife wounds or bruising on the petitioner during this interview, noting "there were no marks on him."  (*Id.* at 451-452, 460).  However, on re-cross-examination, McMillian acknowledged that he does not have any evidence to indicate that this did not start as a matter of self-defense.  (*Id.* at 461-462).

Other law enforcement officials testified about their roles in the collection and testing of evidence in this matter.  (*Id.* at 463-562).  The state medical examiner, Dr. Zia

Sabet, also testified about his observations of Cotton's wounds during her autopsy and his opinions about how Cotton died.  (*Id.* at 570-617).  Dr. Sabet discussed the difference between a "stab wound," which is more of a puncture, and an "incise wound," which is more of a "slash, which would incise the muscular tissue or the skin open."  (*Id.* at 574-575).

Dr. Sabet opined that Cotton suffered one of each type of wound to her neck and that the wounds were close to each other.  (*Id.* at 574).  He further opined that the stab wound that Cotton suffered, which was the fatal wound, was four inches in depth and cut Cotton's hyoid bone, the jugular vein and the carotid artery.  (*Id.* at 575).  Dr. Sabet further testified that the stab wound also injured Cotton's vagus nerve, which affected her ability to breathe and caused hypoxia.  (*Id.* at 579-580).  He estimated that it would take four to five minutes for the victim to become unconscious and another four to five minutes before death would occur.  (*Id.* at 580-581).

Dr. Sabet further testified that Cotton also had a laceration on the right side of the back of her head, some contusions (bruises) on her left chin and other areas of her face, and abrasions and scratches on various extremities, including on her hands and knuckles, which he called "struggle wounds" or "defensive wounds."  The jury was shown various pictures of the victim as Dr. Sabet described these injuries, (*Id.* at 583-602).  He classified Cotton's death as a homicide.  (*Id.* at 602).  On cross-examination, he further noted that Cotton had a blood alcohol content level of .17, which was more than twice the legal limit for intoxication.  (*Id.* at 603).[6]

---

[6]  The Index of Volume III of the trial transcript indicates that the State also presented the testimony of Rebecca Dolen (previously spelled "Dolan" in the Rule 404(b) hearing transcript), Heather Dawn McCloud Merritt (referred to as "Heather McCloud" in the Rule 404(b) hearing transcript) and Walter Ivy Ferguson. However, the undersigned has discovered that pages 676-701 of Volume III of the trial transcript are missing from the copies of the exhibits filed with the court. Thus, the court does not presently have a

The State then rested its case and the defense's motion for judgment of acquittal, which was premised on the State's failure to rebut the self-defense theory, was denied. (ECF No. 7, Ex. 18 at 707-712).

Before testifying himself, the petitioner presented evidence from several Huntington police officers who were involved in responding to domestic disputes between the petitioner and Cotton, which were used to attempt to demonstrate Cotton's demeanor and to establish that Cotton was the aggressor in those instances and had been charged with domestic battery and other offenses. (*Id.* at 723-758; ECF No. 7, Ex. 19 at 921-940). The petitioner also called the Assistant Director of Cabell County 911, who was questioned about specific instances where 911 was contacted regarding incidents involving the petitioner and Cotton. (ECF No. 7, Ex. 18 at 759-786).

The defense also presented the testimony of Tiffany Meade, the petitioner's other girlfriend around the time of these events, as well as the petitioner's family members and a woman for whom the petitioner had done construction work, who were permitted to testify about their own experiences of violence or threatened violence by Cotton, and who witnessed injuries the petitioner sustained as a result of disputes with Cotton or injuries she inflicted on herself. (*Id.* at 809-864; ECF No. 7, Ex. 19 at 952-972). Meade testified that Cotton had a knife during one such altercation. (*Id.* at 814-815, 819-821).

During Duane Blevins' ("Duane")[7] testimony, the petitioner was permitted to play a portion of a 911 call in which Duane called the police because Cotton was "out here

---

complete record of how this evidence was presented to the jury. Nevertheless, the undersigned does not believe that the missing pages are necessary to this court's analysis of the petitioner's habeas corpus claims. By separate Order, the undersigned has ordered the respondent's counsel to immediately locate and file the missing transcript pages, so that the District Court will have access to the complete record.

[7] Duane Blevins is the petitioner's father.

drunker than hell" and "raising hell and screaming." (*Id.* at 828-829).  Duane further told the dispatcher, "All of us was asleep and she is out here busting and beating on the porch." (*Id.* at 829).  The "suspect" then said, "You are right.  You are right.  You are fucking -- " and another "unknown voice" said "You are going to jail." (*Id.*)  Duane identified "Elizabeth Cotton" as the suspect.  (*Id.*)  A second 911 call made by Duane was played for the jury.  On that recording, the "suspect" is heard stating, "I am the fucking -- I am the mother of your fucking grandchild and you are going to sit there and fucking lie about me and say (Inaudible)."  Duane then said "I told you to leave.  Leave.  Leave." (*Id.* at 830).

After these two recordings were played, the judge held a bench conference and ultimately sustained the State's objection about playing any further segments of those recordings because they only reflected 911 dispatch operators or officers talking about Cotton's history and other things that the State contended had nothing to do with the petitioner's interactions with her.  (*Id.* at 831-833).  However, the trial court permitted the defense to present the testimony of several other witnesses concerning an incident on February 20, 2009, in which Cotton violently beat another boyfriend outside a bar in Huntington.  (*Id.* at 941-952, 972-982).

The petitioner was the last defense witness.  He testified about numerous incidents of violence by Cotton, including twice breaking her hand by punching him, and he was able to establish that Cotton had various arrests for domestic violence against him, as well as for fighting with other people and for battery on police officers.  (*Id.* at 1009-1122).

During his direct examination, the petitioner testified about an incident on April 26, 2008, in which Cotton cut her own wrists with a steak knife and then threw the knife at him.  (*Id.* at 1024-1028).  The petitioner also specifically discussed the events of May 31, 2009, when he called the police about Cotton twice in one day.  The first time, he and

14

Cotton had been arguing and she threw a rock and busted a window, but then she left. Thus, when the police arrived, Cotton was not there. (*Id.* at 1039-1040). Later that night, however, Cotton returned and was outside the house yelling at him. When he could not calm her down, he again called the police. According to the petitioner, by the time the police arrived, Cotton had torn her shirt and told them that the petitioner had hit her and tried to rape her, which the petitioner denied. (*Id.* at 1040-1041). However, when defense counsel asked to play the 911 recording of this incident so that the jury could hear Cotton in the background, the trial court only permitted a portion of the recording to be played. (*Id.* at 1046-1047).[8]

The petitioner also testified about another occasion, June 29, 2009, approximately 30 days before Cotton's death, during which the petitioner claims that he called the police about Cotton four times in one day. (*Id.* at 1049-1050). He further testified that, on July 2, 2009, after the petitioner was awarded full custody of their son (with Cotton only having supervised visitation), Cotton showed up at his uncle's house, while the petitioner was there with Tiffany Meade, and Cotton tried to kick in the door. He further stated that Cotton was subsequently arrested for fighting with Meade. (*Id.* at 1050-1055).

Turning to July 28, 2009, the petitioner admitted that Frye gave him the knife that he used to kill Cotton. (*Id.* at 1057). Similar to his recorded confession, the petitioner testified that he and Cotton were fighting over his other girlfriend, and that Cotton "flipped out on me and started hitting me." (*Id.* at 1067). The petitioner stated that he told her to leave, but she kept hitting him. (*Id.*) The petitioner admitted that he hit Cotton more than once and that "the last time I hit her I really hit her pretty hard and it knocked

---

[8] This ruling appears to be the basis for Ground Three in the petitioner's section 2254 petition.

her back on the couch." (*Id.* at 1068). At that point, Cotton "got in her purse and pulled out a knife." (*Id.*) The petitioner testified, "I thought she was going to try to stab me, maybe kill me." (*Id.*)

The petitioner testified that he "was scared" and he ran into the bathroom to get away from Cotton, but before he could barricade the door, she "came through the door and knocked me backwards and then she jumped on top of me." (*Id.* at 1070-1071). The petitioner contended that they were thrashing around when he stabbed her, but he contended that he did not mean to do so. (*Id.* at 1072-1074). Again, similar to his recorded confession, the petitioner testified that he put Cotton's body in the cellar and cleaned up all of the blood and washed his clothes. (*Id.* at 1074-1077).

The petitioner further admitted that he dropped the knife used to stab Cotton in the storm drain and that he put the other knife in a drawer at his mother's house. (*Id.* at 1078). He also admitted that he subsequently told Frye he "had stabbed Elizabeth" and "I am pretty sure she is dead." (*Id.* at 1080). He confirmed that Frye did not ask him what happened or why he did it. (*Id.* at 1080-1081). The petitioner further contended that he asked Frye if he "should" get rid of the body and Frye said he "would have to think about it." (*Id.* at 1081). He denied asking Frye to help him. (*Id.*)

The petitioner testified about the police coming to the house that night. He acknowledged that, prior to taking him into custody, the police asked him where his girlfriend was and he responded "she is in the basement" and further stated, "she is dead." (*Id.* at 1082-1083). He further stated that he told them where the trap door to the basement was located. (*Id.* at 1083). The petitioner also briefly testified about the statement he made at the police station, and asserted that he acted in self-defense. (*Id.* at 1084-1090).

On cross-examination, the State was permitted to rebut the petitioner's extensive evidence asserting that Cotton was the violent and aggressive one in their relationship with evidence concerning the petitioner's own arrest for domestic battery after an incident that occurred at the Adams Landing apartments.  The petitioner's counsel objected to the presentation of this evidence before the jury because the trial court had previously excluded it after the Rule 404(b) hearing.  The following colloquy occurred before the jury:

BY MR. HAMMERS:

Q.    Sir, we have heard a lot of testimony about you and Elizabeth throughout this trial and you have been listening to it.  Is that correct?

A.    Yes, it.

Q.    It's true you and Elizabeth had a lot of problems?

A.    Yes.

Q.    And it is obvious that you fought a lot?

A.    Yes, we did.

Q.    And it was pretty mutual between the two of you?

A.    No -- I never really started them.  I am not saying I didn't start anything, but nine times out of ten it was her.

Q.    All right, sir.  Did -- as a matter of fact, she was arrested for and charged with domestic battery on you?

A.    Yes.

Q.    And you were arrested and charged with domestic battery on her?

A.    Yes.

Q.    As a matter of fact, you were charged with domestic battery on her four times in one day?

17

MR. CRAIG:  Objection, Your Honor.  This is outside -- he knows this.

THE COURT:   Overruled.  I will let him answer that.

THE WITNESS:      Yes.

BY MR. HAMMERS:

Q.      And that was from an incident -- is it at Adams Landing?

A.      Yes, it is.

MR. CRAIG:  Objection.  This has been excluded before.  He already knows
            this.  He opened up the door himself.

THE COURT:    Overruled.

BY MR. HAMMERS:

Q.      Is that true, sir?

A.      Yes.

Q.      That was for things that you did to her?

A.      That she claimed I did to her.

Q.      And the police arrested you for it?

A.      Yes.

Q.      And they took both her word and the injuries she had on her, correct?

A.      Yes.

Q.      And they charged -- they chose to charge you on that occasion?

A.      Yes.

Q.      And that wasn't the only occasion they charged you with domestic
        battery, was it?

A.      I know there was at least one of those incidents where I called the
        police on her and was arrested myself.

Q.      They came and did an investigation and they looked around and they
        didn't charge her, they charged you, didn't they?

A.     Yes.

(*Id.* at 1090-1092).[9]  As noted by the respondent, the jury instructions included a limiting

instruction regarding how the jury could consider the Rule 404(b) evidence.  The limiting

instruction given to the jury stated as follows:

> You have heard evidence concerning alleged conduct and acts of the defendant which are not charged in this Indictment.  You are instructed that such evidence is not admitted as proof of the defendant's guilt on the present charge.  This evidence is admitted for a limited purpose only, and it may be considered by you and only you in deciding whether a given issue has been proven.  In this instance, the evidence of a physical altercation between the defendant and the deceased may be considered only for the purpose of determining whether the State has established motive or intent embracing the commission of two or more acts related to each other so that the proof of one tends to establish the others, the identify [sic; identity] of the person charged with the commission of the crime on trial and to allow you, the jurors, to see the total picture of the events and acts leading to the crimes charged.

> You may not use this evidence in consideration of whether the State has established the crime of homicide as charged in the Indictment.  In addition, such evidence is not relevant to any other matters, such as the character of the defendant, whether the defendant is a bad person, or whether the defendant had a propensity or the disposition to commit the crimes charged.  This evidence may not be considered in that regard since the defendant's character is not an issue.  In addition, it is not proper for the State to prove a criminal case by evidence that a defendant may have committed other criminal acts or may be a bad person.

> Accordingly, this evidence may be considered by you only for the limited purposes for which it has been submitted.

(ECF No. 7, Ex. 20 at 1265-1266; ECF No. 7, Ex. 21).

On January 26, 2012, the petitioner was found guilty of Voluntary Manslaughter,

a lesser-included offense of Murder, and Concealing of a Deceased Human Body.  (*Id.*,

_____

[9]  This evidence is the subject of Ground Two of the petitioner's section 2254 petition.

Ex. 22).  Although the petitioner filed an Emergency Petition for Post-Conviction Bond in the SCAWV, the Court denied that petition on March 8, 2012.  (*Id.*, Exs. 23-25).

On March 19, 2012, the petitioner was sentenced to a term of imprisonment of 15 years on the Voluntary Manslaughter count and a consecutive term of 1-5 years on the Concealment count.  (*Id.*, Ex. 27).  On May 25, 2012, the petitioner filed a Motion to Reduce Sentence under Rule 35(b) of the West Virginia Rules of Criminal Procedure.  (*Id.*, Ex. 34).  Because the Circuit Court had not ruled on the motion, he subsequently renewed that motion on June 23, 2015.  (*Id.*, Ex. 35).  The Circuit Court denied the motion on August 5, 2015.  (*Id.*, Ex. 36).

**B.    The petitioner's direct appeal.**

On September 20, 2012, the petitioner, by counsel, appealed his convictions to the SCAWV, raising four assignments of error.  First, the petitioner asserted that it was error not to suppress his initial statement to police, the evidence resulting from the search of his residence and his subsequent confession because he was not given his *Miranda* rights before he was asked where his girlfriend was and what she was doing.  (*Id.*, Ex. 28).  The petitioner asserted that there were no exigent circumstances, that he was under arrest at that time, and, thus, any evidence gained from his answers to those questions and from the search of his home should be suppressed.  (*Id.* at 10-24).

Second, the petitioner argued that the Circuit Court erred by permitting the use of previously excluded 404(b) evidence.  (*Id.* at 29).  Third, the petitioner contended that it was error to deny the admission of 911 tapes that would demonstrate that Cotton was the aggressor in certain incidents involving her and the petitioner.  (*Id.* at 33).  Finally, the petitioner argued that there was insufficient evidence to overcome his claim of self-defense.  (*Id.* at 35).

On June 24, 2013, the SCAWV affirmed the petitioner's conviction in a Memorandum Decision. (*Id.*, Ex. 30). The Court subsequently denied a rehearing. (*Id.*, Exs. 31-32). On September 3, 2013, the SCAWV issued its Mandate. (*Id.*, Ex. 33).

### C.   The instant section 2254 petition.

It appears that the petitioner has not sought habeas corpus relief in the state courts. Rather, on July 11, 2014, the petitioner filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1), which essentially repeats the claims raised in his direct appeal. Specifically, the petitioner asserts:

1.   The court erred when it failed to suppress Mr. Blevins' initial statement to the police; evidence taken as a result of the illegal search of his father's residence; and his subsequent confession taken.

2.   The court erred when it allowed the prosecution to question Mr. Blevins regarding 404(b) evidence it had previously excluded when the defense did not open the door and that error prejudiced Mr. Blevins' defense.

3.   The court erred when it failed to allow Mr. Blevins to introduce 911 tapes of Mr. Blevins calling the police on Ms. Cotton, clearly describing an on-going emergency when Ms. Cotton was clearly heard in the background.

4.   There was insufficient evidence to overcome Mr. Blevins' claim of self-defense as no witness testified Ms. Cotton did not die as a result of self-defense.

(ECF No. 1).

On July 7, 2016, the respondent filed the instant Motion for Summary Judgment, with exhibits (ECF No. 7), and a Memorandum of Law in support thereof (ECF No. 8). Despite being advised, pursuant to the holding in *Roseboro v.* Garrison, 528 F.2d 309 (4th Cir. 1975), of his right and obligation to respond to the respondent's motion (ECF No. 10), the petitioner failed to so respond. Accordingly, the respondent's motion is undisputed.

## **STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to

22

be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## ANALYSIS

### A.    Fourth and Fifth Amendment claims.

In Ground One of his section 2254 petition, the petitioner contends as follows:

THE COURT ERRED WHEN IT FAILED TO SUPPRESS MR. BLEVINS' INITIAL STATEMENT TO THE POLICE; EVIDENCE TAKEN AS A RESULT OF THE ILLEGAL SEARCH OF HIS FATHER'S RESIDENCE[;] AND[] HIS SUBSEQUENT CONFESSION TAKEN.

(ECF No. 1 at 5).  The petition further asserts:

Mr. Blevins was ordered from his father's house at gunpoint, without a warrant or exigent circumstances present, after officers admitted they believed he had killed Elizabeth Cotton.  He, by officer's own admission, was under arrest, not free to leave and the sole person they went to arrest on the night in question.  Mr. Blevins was surrounded by police officers who ordered [him] to put his hand[s] on his head, walk backwards to officers then get down on his stomach.  He was immediately asked where his girlfriend was and why she was in the basement.  When he answered dead and in the basement, he was immediately arrested for first degree murder, transported to [the] Huntington Police Department and interrogated.  Police also claimed exigent circumstances and immediately entered and searched the defendant's father's home.

(*Id.*)

The determination of whether a confession is admissible in evidence is governed by the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. *Dickerson v. United States*, 530 U.S. 428, 433 (2000); *see also Malloy v. Hogan*, 378 U.S. 1 (1964) (holding that the Fifth Amendment's Self-Incrimination Clause is incorporated in the Due Process Clause of the Fourteenth Amendment and thus applies to the States). Prior to *Miranda v. Arizona*, 384 U.S. 436 (1966), admissibility of a suspect's confession was evaluated under a voluntariness test, arising out of the theory that a coerced confession is inherently untrustworthy and the admission thereof would violate due process. *Dickerson*, 530 U.S. at 433. "The due process test takes into consideration 'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Id.* at 434.

In *Miranda*, the Court "changed the focus of much of the inquiry determining admissibility of suspects' incriminating statements[,]" and concluded that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Id.* at 434-435 (citing *Miranda*, 384 U.S. at 439). Therefore, *Miranda* found that certain procedural safeguards (*i.e.*, warnings concerning the right to remain silent and the right to counsel) are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination.

In *Rhode Island v. Innis*, the Supreme Court discussed the dictates of *Miranda* and defined custodial interrogation as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either *express questioning or its functional equivalent.* That is to say, the term "interrogation" under

> *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. 291, 301 (1980) (emphasis added). The *Innis* Court further emphasized the following statement from *Miranda*:

> "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . .*Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." [384 U.S.] at 478, 86 S. Ct. at 1630.

446 U.S. at 299-300.

The respondent's Memorandum of Law first focuses on the admissibility of the petitioner's initial statements to the police, asserting that the petitioner has mischaracterized that exchange as a "custodial interrogation" and further asserting that the "public safety" exception to the *Miranda* requirement applied in this case. Their Memorandum states:

> Federal law distinguishes between a custodial interrogation of a suspect and a question asked during the apprehension of a suspect, aimed at securing public safety. *New York v. Quarles*, 467 U.S. 649, 656-59, 104 S. Ct. 2626, 2631-633 (1984). In *Quarles*, the police, during the apprehension of the suspect, asked about the location of a gun because of the potential harm that the gun could cause if someone were to find it. *Id.* The United States Supreme Court held that it was not a *Miranda* violation to ask the question without first advising the suspect of his *Miranda* rights. *Id.* The Court reasoned that "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect" and that such ability was necessary due to the "on-the-scene judgments of police officers" that are required "when confronting situations presenting a danger to the public safety." *Quarles*, 467 U.S. at 658-59, 104 S. Ct. at 2633. However, a situation may begin with a question aimed at determining the need for public assistance, but then evolve into testimonial

25

> statements that would require *Miranda* warnings. *Michigan v. Bryant*, 562
> U.S. 344, 365-66, 131 S. Ct. 1143, 1159-160 (2011).

(ECF No. 8 at 17-18).

The respondent further asserts that, in making a determination of what type of questioning has occurred, the *Bryant* Court held that courts should consider whether an on-going emergency exists and whether such questioning occurred in a formal "station-house" setting or in a more informal, disorganized way in a public area. 562 U.S. at 365-66. (ECF No. 8 at 18). Furthermore, as noted by the respondent, the Fourth Circuit has held that the public safety exception applies "absent evidence of actual coercion by the arresting officers . . . ." *U.S. v. Mobley*, 40 F.3d 688, 692 (4th Cir. 1994); *see also U.S. v. Coleman*, 175 F.3d 1016 (4th Cir. 1999). (*Id.*)

The respondent contends that "this was limited questioning that took place for the purpose of discovering the girlfriend's safety status during the apprehension of the suspect." (*Id.*) His Memorandum of Law further states:

> Both questions were not aimed at obtaining testimonial evidence, but
> rather, were directed to discovering whether the girlfriend was in danger.
> This was not a station house interview as Petitioner would have the court
> believe. . . . The questioning happened in the yard of the house in an
> informal manner. The public safety exception applied to this matter under
> clear exigent circumstances. As soon at Petitioner told the police that his
> girlfriend was in the basement and was dead, no further questions were
> asked and Petitioner was placed under arrest and informed of his *Miranda*
> rights.

(*Id.*) The petitioner has not filed any response disputing this contention.

Likewise, the respondent contends that a warrantless search of the house was permissible under the exigent circumstances that were present – specifically, because they were looking for Cotton and her son. The respondent asserts that the police had "an objectively reasonable basis for believing that a person within the house was in need of

assistance." (*Id.* at 19, citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (reiterating that "the ultimate touchstone of the Fourth Amendment is reasonableness"). The *Fisher* Court further stated:

> Therefore, although "searches and seizures inside a home without a warrant are presumptively unreasonable," *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed.2d 1068 (2004) (internal quotation marks omitted), that presumption can be overcome. For example, "the exigencies of the situation [may] makes the needs of law enforcement so compelling that the warrantless search is objectively reasonable. *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S. Ct. 2408, 57 L. Ed.2d 290 (1978).

558 U.S. at 47. (ECF No. 8 at 19). As noted by respondent, the presumption may be overcome by an "emergency aid exception" which permits law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* The respondent notes that, once the police located Cotton's deceased body, they ceased the search of the house.

The petitioner also contends that his subsequent station house confession should have been suppressed because it was "fruit of the poisonous tree" and would not have occurred had the police not relied upon the prior illegally obtained statements and evidence. The undersigned notes, however, that, at the time that the petitioner gave his recorded confession, he had been properly *Mirandized* and he knowingly and voluntarily waived his rights and confessed.

The respondent asserts that this statement is admissible under the Supreme Court's clearly established authority in *Oregon v. Elstad*, 470 U.S. 298, 314 (1985), in which the Court held that the Fifth Amendment does not require the suppression of a confession made after proper *Miranda* warnings and a valid waiver of the suspect's rights, solely because the police had obtained an earlier voluntary, but unwarned, admission

from the suspect. Citing the Fourth Circuit's decision in *U.S. v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005), the respondent's Memorandum further asserts:

> *Elstad* instructs that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to any subsequent, postwarning statement. *Elstad*, 470 U.S. at 314, 105 S. Ct. 1285. Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318, 105 S. Ct. 1285.

For these reasons, the respondent asserts that the petitioner's initial statements, the evidence found in the residence, including Cotton's body, and the petitioner's station house confession were all admissible at trial, and that the petitioner has not demonstrated a sufficient basis for habeas corpus relief based on such admission. The petitioner has not responded to the Motion for Summary Judgment and, thus, has not disputed the respondent's arguments.

> The SCAWV analyzed these claims as follows:

> As the State notes, the Court must first determine if petitioner was subjected to a custodial interrogation, and then must determine if there were exigent circumstances for the interrogation. This Court has stated that "the determination of whether a person was subjected to custodial interrogation for purposes of *Miranda* requires a consideration of the totality of the circumstances." *Damron v. Haines*, 223 W. Va. 135, 141, 672 S.E.2d 271, 277 (2008). Moreover, "the *Miranda* safeguards were never intended to apply to the typical 'on-the-scene' investigation." *Id. Miranda* warnings "are not required when a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation." Syl. Pt. 3, in part, *Damron*.

*State v. Blevins*, No. 12-0438 (Sup. Ct. W. Va. June 24, 2013) (ECF No. 7, Ex. 30 at 3).

The SCAWV further found:

> At the time petitioner gave his initial statement to the police, there was an ongoing emergency based on the statement that there was a dead body under the house and that petitioner intended to throw the body into the Ohio River. Because of these exigent circumstances, petitioner was asked a few short questions concerning the whereabouts of the victim. These questions were purely investigatory rather than accusatory and were not

designed to incriminate petitioner.  Even if petitioner had been in custody, these questions did not amount to an interrogation.

At the time police entered petitioner's father's home after they were told that Cotton was dead, they did not know with certainty whether Cotton was dead or alive, whether her body remained there, whether petitioner was in the process of destroying evidence, or whether petitioner's son was in the house.  All of these exigent circumstances permitted entry without a warrant.

* * *

After the officers made a protective sweep of the house and found the body, all officers were ordered out of the house and the house was secured, so that a warrant could then be obtained to make a full search.  Considering all of the above, the police conducted a proper warrantless entry and search based on the emergency.  Therefore the motion to suppress was properly denied.

(*Id.* at 3-4).

The undersigned has conducted an exhaustive review of the evidence of record. First, the undersigned notes that the petitioner's counsel raised all of the arguments concerning his Fourth and Fifth Amendment claims, and his assertion that all discovered evidence was fruit of the poisonous tree of his unwarned initial admissions, in his Motions to Suppress, and evidence regarding these issues was presented in two pre-trial suppression hearings.  The trial court found that the initial questions asked of the petitioner were not custodial in nature and that exigent circumstances existed that justified both the questioning and the search of the residence.  The trial court further found that the petitioner's subsequent confession to police was voluntarily offered after he was given his *Miranda* warnings.  Thus, the court determined that all of this evidence was admissible at trial.  The petitioner then unsuccessfully raised these same claims in his direct appeal.

In *Stone v. Powell*, the Supreme Court narrowly delineated the scope of review of Fourth Amendment claims in 28 U.S.C. § 2254 by holding:

29

> [W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. 465, 494 (1976).  Then, in *Cardwell v. Taylor,* 461 U.S. 571 (1983), the Supreme Court reaffirmed its decision in *Stone*, and further held that habeas relief could not be granted to a state prisoner on the ground that custodial statements made by him were obtained in violation of the Fourth Amendment.  However, the *Cardwell* Court noted that relief could be granted if such statements were involuntary and therefore obtained in violation of the Fifth Amendment.

The petitioner carries both burdens of pleading and proving the facts and the reasons why he did not receive an opportunity for full and fair litigation.  *Doleman v. Muncy*, 579 F.2d 1258 (4th Cir. 1978).  Here, the record demonstrates that the petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in the state proceedings and the petitioner has not asserted otherwise.  Thus, the undersigned proposes that the presiding District Judge **FIND** that, under *Stone v. Powell, supra,* the petitioner is barred from re-litigating his Fourth Amendment claim in this federal habeas corpus proceeding.

Moreover, based upon the clearly established authority in *Miranda, Innis, Quarles, Bryant* and *Elstad,* the undersigned proposes that the presiding District Judge **FIND** that both the petitioner's initial statements to the police and his later station house confession did not violate his Fifth Amendment rights.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly-established federal law, nor were such decisions based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Consequently, there are no genuine issues of material fact and the respondent is entitled to judgment as a matter of law on Ground One of the petitioner's section 2254 petition.

### B.     Admission of 404(b) evidence.

In Ground Two of his section 2254 petition, the petitioner asserts:

> THE COURT ERRED WHEN IT ALLOWED THE PROSECUTION TO QUESTION MR. BLEVINS REGARDING 404(b) EVIDENCE IT HAD PREVIOUSLY EXCLUDED WHEN THE DEFENSE DID NOT OPEN THE DOOR AND THAT ERROR PREJUDICED MR. BLEVINS' DEFENSE.

(ECF No. 1 at 7). In support of this claim, his petition further states:

> The court had ruled in an order on 404(b) evidence that [the] state could not introduce certain 404(b) evidence it initially offered regarding an alleged domestic incident between Mr. Blevins and Ms. Cotton at her [a]partment at Adams Landing because it did not meet the various requirements for admission. During trial, without the defense opening the door for such questioning, the Prosecution began questioning the defendant about a specific incident which the court had specifically excluded. Without explanation, the court allowed the line of questioning over objection and [later] stated "if the victim's character is in question in this trial so is the defendant's."

(*Id.*)[10]

The SCAWV summarized and addressed the petitioner's claim concerning the admission of previously excluded 404(b) evidence as follows:

> The circuit court properly considered the evidence in question under Rule 404(b) prior to trial and chose to exclude the same. However, at trial, some evidence of petitioner's alleged violence against Cotton was admitted. As the State points out, much more damaging evidence concerning the

---

[10] This claim appears to concern the exchange that occurred between the prosecutor and the petitioner during his cross-examination as described on pp. 17-19 herein. The petitioner was questioned about an incident that occurred between himself and Cotton at the Adams Landing apartments for which the petitioner was arrested. As noted herein, the jury was ultimately instructed that it could only consider this evidence for the limited purpose of determining if the State had established motive or intent and not to consider whether the defendant acted in conformity therewith at the time Cotton died or whether he had bad character.

petitioner's propensity for violence against Cotton was admitted with no objection, and petitioner was permitted to put on evidence of Cotton's violence against him. Therefore, we find that the admission of the evidence of which petitioner now complains is harmless error. * * * Even if the evidence complained of had not been admitted, the remaining evidence was sufficient for a conviction. This evidence consists of, among other things: petitioner's concealment of the body, his disposal of the knife and cleaning of the crime scene, and his admission to Frye. Any prejudicial effect from this evidence was *de minimus*, and did not result in an unfair trial.

(ECF No. 7, Ex. 30 at 5-6).

The respondent contends that this claim is purely a matter of state law and, thus, is not cognizable in federal habeas corpus. (ECF No. 8 at 21). As noted in his Memorandum of Law, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so not only in federal court, but in state court." *Duncan v. Henry*, 513 U.S. 364, 366 (1995). The respondent further contends that the petitioner has not identified any clearly established federal law that was unreasonably applied by the state court in admitting this evidence. He further contends that nothing in the petitioner's argument suggests that the admission of this 404(b) evidence rendered his trial fundamentally unfair. (ECF No. 8 at 22). Again, the petitioner has not disputed this assertion.

The trial court's ruling on the admission of evidence under the state evidentiary rule is a question of state law that is binding on this federal court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998). Thus, the question before this court is simply whether the admission of such evidence was fundamentally unfair or a miscarriage of justice. The Fourth Circuit has stated, "we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding."

*Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993) (internal quotation marks omitted); *see also Estelle*, 502 U.S. at 68 (explaining that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). *Barbe v. McBride*, 521 F.3d 443 (4th Cir. 2008).

The undersigned has reviewed the testimony from the pre-trial hearing, as well as the limited way the complained of evidence was presented in front of the jury during the petitioner's cross-examination. The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that the admission of such evidence was fundamentally unfair or a miscarriage of justice and, thus, the petitioner has not demonstrated a violation of his rights to due process cognizable in federal habeas corpus. The undersigned further proposes that the presiding District Judge **FIND** that the state court's ruling on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and, thus, the respondent is entitled to judgment as a matter of law on Ground Two of Petitioner's section 2254 petition.

## C.   Denial of admission of 911 recording.

In Ground Three of his section 2254 petition, the petitioner asserts:

> THE COURT ERRED WHEN IT FAILED TO ALLOW MR. BLEVINS TO
> INTRODUCE 911 TAPES OF MR. BLEVINS CALLING THE POLICE ON
> MS. COTTON CLEARLY DESCRIBING AN ON-GOING EMERGENCY
> WHEN MS. COTTON WAS CLEARLY HEARD IN THE BACKGROUND.

(ECF No. 1 at 8). The petition further states:

> The State repeatedly intimated and attempted to prove Mr. Blevins was the
> initial violent aggressor and his normal reaction to Ms. Cotton's behavior

33

was violence. After he was questioned about specific incidents by the State, the defense attempted to play portions of the tapes to demonstrate, on more than one occasion, Mr. Blevins had called the police and literally begged for outside assistance instead of resorting to violence. The court denied his attempt to play and admit such evidence.

(*Id.*) The SCAWV addressed this issue as follows:

> Petitioner also argues that the circuit court erred when it failed to allow petitioner to introduce 911 tapes of petitioner calling the police about Cotton, clearly describing an ongoing emergency, when Cotton was heard in the background causing a disturbance. This Court has held, "'[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.'" Syl. Pt. 1, *State v. Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011) (internal citations omitted). A review of the record shows that petitioner testified to the incident in the 911 tapes at great length. Moreover, at least one of the 911 tapes was played during petitioner's father's testimony. Because of other statements on the tapes, including statements of 911 dispatchers and police officers, the tapes could not be played in their entirety. Therefore, this Court finds no error in the circuit court's ruling disallowing the introduction of the 911 tapes.

(ECF No. 7, Ex. 30 at 6).

Similar to Ground Two, the respondent's Memorandum of Law asserts that this claim is purely a challenge to a state evidentiary ruling, and does not, in any way, assert or implicate a matter of federal law that is actionable in federal habeas corpus. (ECF No. 8 at 23-24). His Memorandum of Law further contends, "[a]dditionally, Petitioner has not provided any argument that suggests that the failure to admit the 911 tape rendered his trial fundamentally unfair. While the 911 tape was excluded, Petitioner was permitted to introduce evidence regarding the victim's propensity for violence, including his lengthy testimony regarding the 911 call." (*Id.* at 24). The petitioner has not disputed this argument.

The undersigned agrees that the petitioner has not asserted a cognizable federal constitutional claim with respect to the trial court's refusal to admit the 911 tapes in

question.  As noted by the respondent, the SCAWV treated this claim purely as an evidentiary ruling made within the sound discretion of the trial court, and the court noted that the petitioner was not prejudiced by the exclusion of the tapes because the petitioner was permitted to testify at length about the victim's behavior during such incidents.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that the trial court's refusal to allow the jury to hear all of the 911 tapes at trial was fundamentally unfair or a miscarriage of justice and, thus, the petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus.  The undersigned further proposes that the presiding District Judge **FIND** that the state court's ruling on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground Three of the petitioner's section 2254 petition.

### D.    Sufficiency of evidence to rebut self-defense theory.

In Ground Four of his section 2254 petition, the petitioner asserts:

> THERE WAS INSUFFICIENT EVIDENCE TO OVERCOME MR. BLEVINS' CLAIM OF SELF-DEFENSE AS NO WITNESS TESTIFIED MS. COTTON DID NOT DIE AS A RESULT OF SELF-DEFENSE AND THE STATE [FAILED TO OFFER AN ALTERNATIVE THEORY OF MS. COTTON'S DEATH.][11]

(ECF No. 1 at 10).  The petition further states:

> The State did not offer a single shred of evidence to rebut Mr. Blevins' claim of self-defense.  In fact, three of the State's witnesses admitted they had no evidence to rebut a [claim] of self-defense including the medical examiner who testified Ms. Cotton's wounds came quickly in a struggle.  When asked, "like in self-defense?"  He replied yes.

---

[11] In the petitioner's section 2254 form petition, the portion of this claim contained in brackets was left out. However, because it appears that the petitioner has re-asserted the same claims raised in his direct appeal, the undersigned derived the remainder of the sentence from the claim set forth in the petitioner's appellate brief (ECF No. 7, Ex. 28 at 4).

(*Id.*)

The respondent's Memorandum of Law addresses this claim as follows:

> While Petitioner's claim is wrapped in the guise of self-defense, Petitioner's argument is no more than an insufficiency of evidence claim. To determine whether the evidence is sufficient to support a conviction as a matter of due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). West Virginia has adopted the *Jackson* standard. *See State v. Guthrie,* 194 W. Va. 657, 668, 461 S.E.2d 163, 174 (1995).

(ECF No. 8 at 25). The undersigned agrees that this is the appropriate and clearly established federal law under which this claim must be reviewed.

The respondent contends that there was sufficient evidence to support the petitioner's conviction, notwithstanding his claim of self-defense. His Memorandum of Law further states:

> Petitioner acts as if there has to be an actual witness to the murder who could testify that it was not self-defense or that an expert must testify that self-defense was not possible, but that is not the law. (*See* ECF No. 1 at 10). The jury did hear evidence that Petitioner obtained at least one (1) knife from Mr. Frye. The jury heard testimony that Petitioner killed the victim by stabbing her in the neck. Petitioner put the victim's body in the cellar, wrapped in sheets and garbage bags and hidden under other items. Petitioner used bleach to clean up all the blood and washed his clothes. Then, Petitioner threw the knife that he used to stab the victim into the sewer. The jury also heard Mr. Frye testify that Petitioner told him that he killed the victim and asked for help to get rid of the body. The jury also heard testimony from the autopsy regarding other blunt force trauma to the victim. In contrast, Petitioner did not have any bruising or knife wounds. Additionally, the jury was capable of judging Petitioner's credibility as he testified to his claims of self-defense. As such, there was sufficient evidence for the jury to conclude that he was guilty.

(ECF No. 8 at 25-26). The petitioner has not disputed this argument.

After citing the appropriate sufficiency of evidence standard as addressed in *Guthrie*, *supra*, the SCAWV first addressed the burden of proof when a self-defense

theory is raised by a defendant, stating, "[i]n relation to self-defense, '[o]nce there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." (ECF No. 7, Ex. 30 at 6-7) (citing Syl. Pt. 4, *State v. Kirtley*, 162 W. Va. 249, 252 S.E.2d 374 (1978)). The SCAWV then found that there was sufficient evidence to overcome the self-defense theory and to support the petitioner's conviction. The Court's Memorandum Decision states:

> A review of the record shows that the evidence was sufficient to support petitioner's voluntary manslaughter conviction. The evidence showed that petitioner stabbed Cotton in the neck; Cotton also suffered blunt force trauma to her head and face; and petitioner had no knife wounds to his body, despite his claim that Cotton was attacking him. The jury heard all of the evidence and made the determination that petitioner was guilty of voluntary manslaughter and was not acting in self-defense.

(ECF No. 7, Ex. 30 at 7).

As instructed by the trial court, a conviction for voluntary manslaughter required a finding beyond a reasonable doubt that "the Defendant, JESSE BLEVINS, in Cabell County, West Virginia, on or about the 28th day of July, 2009, did feloniously, unlawfully and intentionally, without premeditation, deliberation or malice, upon sudden provocation and in the heat of passion, kill Elizabeth Cotton." (ECF No. 7, Ex. 20 at 1270). Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of voluntary manslaughter beyond a reasonable doubt, in accordance with *Jackson v. Virginia*. Based upon an exhaustive review of the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that there was sufficient evidence for a rationale trier of fact to find that the petitioner killed Cotton upon sudden provocation and in the heat of passion, and not in self-defense.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state court's ruling on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based upon an unreasonable determination of the evidence presented in the state court proceedings. Therefore, the undersigned further proposes that there is no genuine issue of material fact and the respondent is entitled to judgment as a matter of law on Ground Four of the petitioner's section 2254 petition.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 7), **DENY** the petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1), and dismiss this civil action from the docket of this court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of

Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Chief Judge Chambers.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the petitioner and to transmit a copy to counsel of record.

February 24, 2017

Dwane L. Tinsley
United States Magistrate Judge

39